UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REYNALDO SMITH,

          Plaintiff,

v.                                 CASE NO:  8:11-cv-02388-T-27TGW

DEPUTY ROGER DIXON,
individually, DEPUTY DAVID
KENNEDY, individually, and
CORPORAL ROBERT MELTON,
individually,

          Defendants.
_____/

## ORDER

**BEFORE THE COURT** is Defendants' Dispositive Motion for Summary Judgment (Dkt.18).  Because Defendants are entitled to qualified immunity, Defendants' Dispositive Motion for Summary Judgment (Dkt.18) is **GRANTED**.

### Introduction

Plaintiff asserts claims for damages against Defendants in their individual capacity under 42 U.S.C. § 1983 *et seq.*, based on alleged violations of the First and Fourth Amendment to the Constitution.  Specifically, Plaintiff alleges that Defendants falsely arrested Plaintiff as a result of his free speech.  Defendants counter that probable cause existed for the arrest and that, to the extent a constitutional violation occurred, they are entitled to qualified immunity.

## Factual Background[1]

Shortly after midnight on February 2, 2009, Defendants David Kennedy, Roger Dixon, and Robert Melton[2] responded to a report of an armed domestic dispute at 6722 Marina Point, Tampa, Florida, Apartment No. 204. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 12, 17.[3]   Shabeon Wilson had called 911 to report a disturbance at the apartment he shared with Onika Bess. *See, e.g.,* 911 Transcript (Dkt. 18-1), pp. 1, 3.   Mr. Wilson told the 911 operator that Ms. Bess' boyfriend had become upset, had kicked in the front door to the apartment, and had confronted Ms. Bess. *Id.* at p. 3.   Mr. Wilson identified the boyfriend as the Plaintiff, Reynaldo Smith, and informed the 911 operator that Mr. Smith was a Pinellas County law enforcement officer. *Id.* at pp. 4, 6.   Mr. Wilson further indicated that prior to the incident at the apartment, Mr. Smith had engaged in an altercation with another individual that resided in the same apartment complex and that Mr. Smith may have been drinking. *Id.* at p. 4.   Mr. Wilson confirmed that Mr. Smith was still in the apartment and told the 911 operator that he would wait in the parking lot for the police to arrive.   During the 911 call, Mr. Wilson expressed that he was "scared of my life." *Id.* at p. 5.

---

[1] The deposition testimony, police reports, and other documentation submitted by Defendants may properly be considered on summary judgment.  For example, "[i]t is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not." *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (internal citations omitted).  The "factual findings" in the internal affairs reports are also admissible under an exception to the hearsay rule, Fed. R. Evid. 803(8), although summaries of interviews that are contained in those reports are double hearsay that cannot be admitted at trial or considered on summary judgment. *See Roxbury–Smellie v. Fla. Dep't of Corr.*, 324 Fed. App'x 783, 785 (11th Cir. 2009) (district court properly refused to consider on summary judgment the notes taken by an EEOC investigator summarizing interviews with plaintiff's co-workers).  Moreover, Mr. Smith's own statements made under oath in connection with the internal affairs investigations are admissible as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2).

[2] Deputies Roger Dixon, Stephen Bohling, and Corporal Melton  arrived at the scene after deputies Kennedy and Davidson. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 13-15, 17.

[3] Deputy Kennedy testified that he recalled the call was for an armed home invasion, but conceded it could have been for an armed domestic battery. Kennedy Depo. (Dkt. 19), p. 4, 27.

2

When the deputies arrived at the apartment complex, they were flagged down by Mr. Wilson who was located approximately three buildings away from his apartment. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 6-7; Dixon Depo. (Dkt. 20), p. 16. Mr. Wilson informed the deputies that he had heard Mr. Smith break down the front door to the apartment, saw Mr. Smith enter the apartment upset and looking for Ms. Bess (Ms. Bess was not home when Mr. Smith first arrived at the apartment), saw Mr. Smith carrying an unholstered gun near his thigh, and that Mr. Smith was currently employed as a law enforcement officer. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 7, 34; Dixon Depo. (Dkt. 20), pp. 40-41; HCSO Report (Dkt. 18-4), p. 25. Mr. Wilson indicated that after Ms. Bess arrived home, she and Mr. Smith began to argue in her bedroom. *See, e.g.,* HCSO Report (Dkt. 18-4), p. 25. Mr. Wilson told the deputies that Mr. Smith was still upstairs in the apartment with a gun and that he had called 911 because he was scared for his safety and worried that "things could get out of control." *See, e.g.,* Dixon Depo. (Dkt. 20), p. 42; HCSO Report (Dkt. 18-4), p. 25. The deputies observed that Mr. Wilson was scared of Mr. Smith. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 7, 25; Dixon Depo. (Dkt. 20), p. 16; *see also* HCSO Report (Dkt. 18-4), p. 25.

Mr. Wilson led the deputies upstairs and showed them the location of the apartment. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 16-17. The door to the apartment was open and the deputies observed a badly damaged/cracked door frame with the door being forced inward and off of its hinges. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 7, 22; Dixon Depo. (Dkt. 20), pp. 21, 37-38.[4] Based on their conversations with Mr. Wilson, the deputies believed that Mr. Smith had kicked in the door

---

[4] Mr. Smith has given various contradictory accounts as to how and why the door was damaged. For example, during his deposition Mr. Smith testified that he believed it was the deputies that damaged the door. *See, e.g.,* Smith Depo. (Dkt. 21), pp. 7-9. In contrast, during an internal affairs investigation Mr. Smith testified under oath that the door was stuck and that the door was damaged when he pushed the door open. *See* Smith's 3/19/2009 Employee Statement Form (Dkt. 18-6), pp. 3, 8. Regardless, it is undisputed that the door was damaged and that, based on Mr. Wilson's comments, the deputies believed it was Mr. Smith who had broken the door to reach Ms. Bess.

to gain access to the apartment. *See, e.g.*, Kennedy Depo. (Dkt. 19), p. 7; Dixon Depo. (Dkt. 20), pp. 40-41. The deputies entered the apartment with their guns drawn. The apartment was quiet until Mr. Smith emerged from the closed door to Ms. Bess' bedroom and told the deputies to "put your guns away." *See, e.g.*, Kennedy Depo. (Dkt. 19), pp. 7-9, 25.[5] The deputies kept their guns drawn until they were able to confirm that Mr. Smith was unarmed. *See, e.g.*, Kennedy Depo. (Dkt. 19), pp. 8-9.

After determining that there was no imminent danger, the deputies began an investigation to determine if Mr. Smith and Ms. Bess were involved in a domestic disturbance. *See, e.g.*, Kennedy Depo. (Dkt. 19), pp. 8-9; HCSO Report (Dkt. 18-4), p. 22. Mr. Smith refused to cooperate with the deputies, however, and yelled at the deputies telling them that there was nothing going on and there was no need for the deputies to remain at the apartment. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 26-27; Dixon Depo. (Dkt. 20), p. 25.

In furtherance of their investigation, the deputies attempted to separate Mr. Smith and Ms. Bess in order to obtain their independent recollection of the events and ensure Ms. Bess' safety. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 15-16, 19, 32; Dixon Depo. (Dkt. 20), pp. 18.[6] Mr. Smith continued to be uncooperative, however, and repeatedly told Ms. Bess that she did not have to talk to the deputies or go with them to a different location. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 12, 18, 20, 22, 30, 32-33, 35-36; HCSO Report (Dkt. 18-4), p. 21. Deputy Kennedy testified that Mr. Smith

---

[5] Deputy Kennedy testified that "[t]ypically when you've got a gun pointed at you, people are very compliant" and that Mr. Smith "was demanding [the officers] to put the guns away, not asking." Kennedy Depo. (Dkt. 19), pp. 8-9. Deputy Kennedy further testified that Mr. Smith shouted various obscenities at the deputies with a "very aggressive" demeanor. *See, e.g.*, Kennedy Depo. (Dkt. 19), pp. 7-9, 25.

[6] Mr. Smith stated under oath during his internal affairs investigation that he also separates and talks to each side when investigating a domestic disturbance. *See* Smith's 3/19/2009 Employee Statement Form (Dkt. 18-6), p. 13.

4

told Ms. Bess that she did not have to talk to the deputies and that he instructed her not to talk to the officers. *See* Kennedy Depo. (Dkt. 19), p. 32.[7]   The deputies observed that Ms. Bess seemed frightened and intimidated by Mr. Smith. *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 14-15, 29; Dixon Depo. (Dkt. 20), pp. 20-22, 33-36; HCSO Report (Dkt. 18-4), p. 21.[8]

After 15 to 30 minutes of attempting to separate Ms. Bess and Mr. Smith, the deputies were finally able to get Mr. Smith to go downstairs. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 12, 26-27. Even after he was outside the apartment, however, Mr. Smith continued to tell Ms. Bess not to talk to the deputies and became louder, more irate, and more belligerent toward the deputies. *See, e.g.,* Dixon Depo. (Dkt. 20), pp. 13, 26-29. Mr. Smith indicated that he had been at a party earlier in the night and several of the officers observed that he appeared intoxicated and had a strong smell of alcohol on his breath. *See, e.g.,* Melton Affidavit (Dkt. 18-9), ¶ 16; Dixon Depo. (Dkt. 20), pp. 26, 29; HCSO Report (Dkt. 18-4), pp. 22-23; DeKay Statement (Dkt. 18-10), pp. 3-4.[9]

On route to the scene of the incident, Defendant Robert Melton, a supervisor and Master Corporal with the Hillsborough County Sheriff's Office, spoke with Deputy Kennedy who advised him that the suspect was a St. Petersburg Police Officer and had brandished a weapon during an

---

[7] The deputies testified that at this point, Mr. Smith grabbed Ms. Bess by the arm in a manner the deputies viewed as attempt to prevent Ms. Bess from speaking with them. *See, e.g.,* Kennedy Depo. (Dkt. 19), p. 12, 15; Dixon Depo. (Dkt. 20), pp. 18, 20, 22, 30, 32-33, 35-37; HCSO Report (Dkt. 18-4), p. 21. Mr. Smith and Ms. Bess deny that Mr. Smith ever grabbed Ms. Bess' arm and contend that they sat on the floor "Indian style" while the deputies attempted to conduct their investigation. Mr. Smith, however, does not deny that he told the officers to put away their guns or that he told Ms. Bess that she did not have to speak to the deputies.

[8] Deputy Dixon testified that Ms. Bess was intimidated and "she would say anything to like cover up for [Mr. Smith]." Dixon Depo. (Dkt. 20), pp. 21-22. Deputy Kennedy testified that Ms. Bess initially "seemed relatively calm for the situation," but later "seemed pretty uncomfortable" and "clearly intimidated." Kennedy Depo. (Dkt. 19), pp. 12, 29. Ms. Bess claims that she was neither frightened nor intimidated by Mr. Smith.

[9] Deputy Kennedy testified that he could not recall whether Mr. Smith was intoxicated or had an odor of alcohol on his breath. Kennedy Depo. (Dkt. 19), p. 10.

5

alleged domestic violence incident. *See* Melton Affidavit (Dkt. 18-9), ¶ 5. Corporal Melton could

hear Mr. Smith yelling in the background and became concerned for all persons involved based on

the nature of the call. *See* Melton Affidavit (Dkt. 18-9), ¶¶ 6-8. Upon arriving at the apartment

complex, Corporal Melton could hear Mr. Smith yelling and screaming from approximately fifty

yards away. *See, e.g.*, Melton Affidavit (Dkt. 18-9), ¶ 9; HCSO Report (Dkt. 18-4), p. 23. Corporal

Melton attempted to calm Mr. Smith down, but Mr. Smith ignored Corporal Melton's efforts to

diffuse the situation. At this point, Corporal Melton determined that the only way to complete the

investigation was to detain Mr. Smith in an attempt to prevent his disruptive behavior. *See, e.g.*,

Melton Affidavit (Dkt. 18-9), ¶¶ 11-12; Kennedy Depo. (Dkt. 19), pp. 19-20, 26; HCSO Report (Dkt.

18-4), p. 24.[10] Deputy David DeKay subsequently arrived on scene and observed that despite being

in handcuffs, Mr. Smith continued to be noncompliant and refused to settle down at the request of

the officers. *See* Dekay Statement (Dkt. 18-10), pp. 2-3.

Despite admittedly receiving numerous warnings that he would be arrested if he continued

to impede the investigation, Mr. Smith continued to be uncooperative.[11] As a result, Mr. Smith was

arrested for obstruction of justice based on his disruptive behavior, including what the deputies

perceived as his intimidation of Ms. Bess, which prevented them from completing their

investigation. *See, e.g.,* Melton Affidavit (Dkt. 18-9), ¶¶ 13-15; Kennedy Depo. (Dkt. 19), pp. 18;

[10] According to Deputy Dixon, Mr. Smith's constant yelling and screaming made communication "virtually impossible." HCSO Report (Dkt. 18-4), p. 22; *see also* Kennedy Depo. (Dkt. 19), pp. 28-29. Deputy Kennedy expressly testified that Mr. Smith was impeding their investigation. *See* Kennedy Depo. (Dkt. 19), pp. 27-28.

[11] Mr. Smith testified under oath at his internal affairs investigation that he was warned two or three times before he was actually arrested. *See* Smith's 3/19/2009 Employee Statement Form (Dkt. 18-6), p. 16.

6

Dixon Depo. (Dkt. 20), pp. 13, 26-27, 32-36.[12]  After his arrest, Mr. Smith refused to respond to

Corporal Melton's questioning as to whether he was a law enforcement officer.  *See, e.g.,* Melton

Affidavit (Dkt. 18-9), ¶18; Dixon Depo. (Dkt. 20), pp. 4-5, 31; HCSO Report (Dkt. 18-4), pp. 22,

24.

The deputies subsequently found Mr. Smith's holstered and loaded .40 caliber Glock under

the bed in the bedroom where he and Ms. Bess were located upon the officers' arrival.  *See, e.g.,*

Kennedy Depo. (Dkt. 19), pp. 21-22;  HCSO Report (Dkt. 18-4), p. 21.   In addition, despite Mr.

Smith's statements to the contrary, the officers were unable to confirm that he was a lawful resident

of the apartment and, in fact, Mr. Smith's driver's license listed a different address as his principal

residence.  *See, e.g.,* Kennedy Depo. (Dkt. 19), pp. 5-6; Dixon Depo. (Dkt. 20), pp. 30-31.[13]

Following an internal affairs investigation, Mr. Smith resigned his position with the St.

Petersburg Police Department on September 10, 2009.  The internal affairs report indicated that had

Mr. Smith not resigned his position, he would have been terminated based on the events of February

2, 2009.  *See* Internal Affairs Report (Dkt. 18-12).

### Applicable Standard

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to

interrogatories, affidavits and admissions on file show that there is no genuine issue as to any

---

[12] Deputy Kennedy testified he believed other crimes may also have been committed, including domestic violence, trespass, criminal mischief, and armed home invasion. Kennedy Depo. (Dkt. 19), pp. 13-14, 29-30.

[13] Whether Mr. Smith was a lawful resident of the apartment is a disputed fact. *See, e.g.,* Smith Depo. (Dkt. 21), pp. 5-6. For example, Deputy Kennedy testified that they never found a key to the apartment on Mr. Smith's person and there was none of Mr. Smith's clothing at the apartment to indicate that he lived at the apartment. *See, e.g.,* Kennedy Depo. (Dkt. 19), p. 31. Moreover, during the internal affairs investigation it appears that Mr. Smith was unable to produce a lease identifying him as a lessee of the apartment. *See* Smith's 6/02/2009 Employee Statement Form (Dkt. 18-7), pp. 2-14. Because the qualified immunity analysis relies on the knowledge available to the deputies at the time of the arrest, however, this disputed fact is not material.

7

material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

Qualified immunity is a question of law for the courts, even when asserted on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As the Eleventh Circuit has stated:

> The objective nature of qualified immunity defines what fact issues
> are material for summary judgment purposes. To avoid summary
> judgment it is not enough for a plaintiff to produce evidence, which

8

– if believed (for summary judgment its truth is assumed) – would allow a fact-finder to find just that the government-agent defendant was, in reality, wrong about the facts on which the defendant acted. Instead, to defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in defendant's position could have thought the facts were such that they justified defendant's acts.

*Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11ᵗʰ Cir. 1993) (citing *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1234-35 (11ᵗʰ Cir. 1992)).

## Discussion

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As such, qualified immunity allows officials to "carry out their discretionary duties without fear of personal liability or harassing litigation[.]" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citations omitted). "[O]nly in exceptional circumstances will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11ᵗʰ Cir. 1994) (*en banc*) (citations and emphasis omitted). Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), its purposes would be "thwarted if a case is erroneously permitted to go to trial." *Baltimore v. City of Albany, Georgia*, 183 Fed. App'x 891, 895 (11ᵗʰ Cir. 2006) (citations and quotations omitted).

To receive qualified immunity, the public official must first prove that they were acting within the scope of their discretionary authority during the events in question. *Lee v. Ferraro*,

9

284 F.3d 1188, 1194 (11th Cir. 2002). In this case, there is no dispute that Defendants were acting within the scope of their discretionary authority in investigating a possible incident of domestic violence and when arresting Mr. Smith. *See, e.g., Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir. 2004).

Once a showing of discretionary authority is established, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lewis v. City of W. Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir. 2009). First, a plaintiff must show that, considered in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). If no constitutional right was violated, the defendant is entitled to qualified immunity.[14] If the facts establish a constitutional violation, a plaintiff must then show that, at the time the incident occurred, "every reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke Co.,* 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing *Saucier,* 544 U.S. at 201-02).

An arrest does not violate the Fourth Amendment so long as a police officer has probable cause for the arrest. *See, e.g., Wood v. Kesler,* 323 F.3d 872, 878 (11th Cir. 2003). Probable cause exists if "the facts and circumstances within *the officer's knowledge,* of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir. 1990) (emphasis added). "Probable

---

[14] When a plaintiff fails to establish a constitutional violation, any facts still in dispute are rendered immaterial. *See Bennett v. Parker,* 898 F.2d 1530, 1532 (11th Cir. 1990). That is, "[i]f the facts taken in the light most favorable to the plaintiff do not establish a constitutional violation, then the public official should be granted summary judgment as a matter of law." *Id.* (citing *Brown v. Smith,* 813 F.2d 1187, 1188 (11th Cir. 1987)).

10

cause requires more than mere suspicion, but does not require convincing proof." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1120 (11th Cir. 1992).

When an officer asserts qualified immunity, the issue is not whether probable cause existed in fact, but whether the officer had "arguable" probable cause to arrest. *Moore v. Gwinnett County*, 967 F.2d 1495, 1497 (11th Cir. 1992). That is, the officer is entitled to qualified immunity if a reasonable officer "could have believed probable cause existed." *Id.*; *see United States v. Clark*, 559 F.2d 420, 425 (5th Cir. 1977) (stating that "even if the officers felt that probable cause was lacking, an objective standard would still be applicable").[15] Moreover, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotations omitted).[16]

Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007). Showing arguable probable cause does not, however, require proof of every element of a crime. *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had arguable probable cause to arrest for *any* offense, qualified immunity applies. *Skop*, 485 F.3d at 1138.

Construing the facts and inferences in the light most favorable to Plaintiff, it is evident that the officers had at least arguable probable cause to arrest Mr. Smith for obstruction. Under Florida

---

[15] "[T]he question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to the underlying intent or motivation ... . It must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Kesinger*, 381 F.3d at 1248 (citations omitted).

[16] "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

law, it is a crime not only to oppose or obstruct a law officer in the execution of the officer's duty, but also to attempt to oppose or obstruct the officer. *See* Fla. Stat. § 843.02; *Fields v. State*, 685 So.2d 961 (Fla. 4th DCA 1996); *State v. Tousignant*, 460 So.2d 450 (Fla. 2d DCA 1984). A conviction for obstruction requires a showing that (1) the officer was engaged in lawful execution of a legal duty, and (2) the action by the defendant constituted obstruction. *See S.G.K. v. State*, 657 So.2d 1246 (Fla. 1st DCA 1995). In this case, a reasonable officer could have concluded that the Defendants were engaged in the execution of a legal duty (*i.e.*, investigating a 911 call)[17] and Mr. Smith obstructed the Defendants by, *inter alia*, refusing to allow the officers to speak to him and Ms. Bess separately.

Mr. Smith relies heavily on his deposition testimony and an affidavit of Ms. Bess to avoid summary judgment. Both Mr. Smith and Ms. Bess admit that they had an argument, but deny that there was any violence or that police involvement was needed. *See, e.g.*, HCSO Report (Dkt. 18-4), pp. 26-27.[18] While it is unclear what happened after the officers entered the apartment, it is undisputed that Mr. Smith told Ms. Bess she did not have to talk to the police and told the police to put away their guns. And it is undisputed that the officers were thwarted in their ability to conduct a domestic violence investigation because Mr. Smith refused to allow the officers to separately question him and Ms. Bess.

---

[17] Plaintiff's contention that the officers were not engaged in the execution of a lawful duty because they had no legal right to enter the apartment is misplaced. The undisputed evidence reveals that at the time they entered the open door to the apartment, the officers had probable cause to believe that a crime was being, or was about to be, committed, and that Ms. Bess was in danger.

[18] For example, Ms. Bess' affidavit indicates that she and Mr. Smith lived in the apartment, Mr. Smith had a key to the apartment, Mr. Smith pushed the door because it was stuck, she was the aggressor in a verbal argument with Mr. Smith, there was no need for police to conduct an investigation, she was not intimidated by Mr. Smith, Mr. Smith did not appear intoxicated, Mr. Smith never touched her inappropriately to prevent her from speaking with police, and she did not want to speak with the police the night of the incident. *See* Affidavit of Onika Bess (Dkt. 24-1).

In sum, a reasonable officer could have believed that Mr. Smith's conduct constituted obstruction under Florida law. *See, e.g., Sullivan v. City of Pembroke Pines*, 161 Fed. App'x 906, 909–910 (11th Cir. 2006) (unpublished opinion) (probable cause to arrest under § 843.02 because plaintiff's repeated verbal interruptions during a police investigation); *Post*, 7 F.3d at 1559 (arguable probable cause to arrest under § 843.02 when the plaintiff had a history of outbursts towards the police and appeared to be inciting bystanders); *Zivojinovich v. Barner*, 525 F.3d 1059, 1063–64, 1071-72 (11th Cir. 2008) (probable cause to arrest under § 843.02 after plaintiff twice stood up and spoke after being told to sit down).[19] Because the officers had arguable probable cause to arrest Mr. Smith, they are entitled to qualified immunity from suit on the claim for false arrest under the Fourth Amendment.

In addition to arguable probable cause for the arrest of Mr. Smith for obstruction, the undisputed facts demonstrate that arguable probable cause existed for the officers to arrest him for one or more other criminal offenses, including criminal mischief based on the damage to the apartment door. *See* Fla. Stat. § 806.13(1)(a).[20] For example, it is undisputed that the officers went to the apartment complex believing that an armed domestic dispute may be in progress. Similarly, it is undisputed that after speaking with Mr. Wilson, the officers believed that Mr. Smith was armed, broke the door to the apartment,[21] and was engaged in a domestic altercation with Ms. Bess. *Cf.*

---

[19] The issue is not whether Mr. Smith did in fact commit acts of obstruction or attempt to do so. The issue material to qualified immunity is whether a reasonable officer in the Defendants' place could have thought the facts were such that he could reasonably conclude that Mr. Smith was committing, or was about to attempt, acts of obstruction. *Post*, 7 F.3d at 1559, n.8.

[20] "[T]he validity of the arrest does not turn on the offense announced by the officer at the time of the arrest." *Lee*, 284 F.3d at 1195–96.

[21] There is also no dispute that the door was open and damaged when the officers arrived.

13

*Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) ("Generally, an officer is entitled to rely on victim's criminal complaint as support for probable cause.").

The existence of arguable probable cause for the arrest also defeats Plaintiff's claim for retaliation under the First Amendment. *See Reichle v. Howards,* 132 S.Ct. 2088, 2096-97 (2012); *Phillips v. Irvin*, 222 Fed. App'x 928, 929 (11th Cir. 2007); *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003); *Colosimo v. City of Port Orange*, No. 6-04-CV-1491-ORL-31DAB, 2005 WL 1421294, at *7 (M.D. Fla. June 16, 2005); *see also Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) (affirming summary judgment on retaliatory arrest claim in violation of plaintiff's First Amendment rights and stating that "[w]hatever the officers' motivation, however, the existence of probable cause … defeats her … claim"); *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest [the plaintiff] for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims."); *Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002) (noting that "retaliatory criminal prosecutions in violation of the First Amendment are actionable only if a plaintiff can also prove the common-law elements of malicious prosecution, including the absence of probable cause to prosecute"). *But cf. Bennett v. Hendrix*, 423 F.3d 1247, 1255-56 (11th Cir.

2005) (alleged prolonged and organized campaign of harassment by local police officers was sufficient to allege violation of First Amendment rights by virtue of retaliatory conduct).[22]

**Conclusion**

Based on the foregoing, it is **ORDERED** that Defendants' Dispositive Motion for Summary Judgment (Dkt.18) is **GRANTED**. The Clerk is directed to enter final judgment in favor of Defendants and against Plaintiff and **CLOSE** this case.

**DONE AND ORDERED** this __*15*__ day of April, 2013.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

---

[22] Moreover, Mr. Smith was not arrested for his speech, but rather his behavior by which he impeded the officers' ability to investigate whether a crime had occurred prior to their arrival. *See, e.g.*, Dixon Depo. (Dkt. 20), pp. 36-37; Kennedy Depo. (Dkt. 19), p. 37. For example, Deputy Dixon testified that it was not the content of what Mr. Smith was saying, but rather the manner in which he was saying it that led to his arrest for obstruction. *See* Dixon Depo. (Dkt. 20), pp. 36-37. Deputy Kennedy similarly testified that it was the nature of Mr. Smith's behavior as opposed to the content of his speech that led to his arrest for obstruction:

> Well, again, in his belligerent, nasty tone, his demeanor, with the conjunction of holding her by the arm, yeah, it would still be an obstruction. If he wouldn't allow us to ask her any questions or allow her to answer, whether he was talking about the weather or not, it would still be considered an obstruction.

Kennedy Depo. (Dkt. 19), p. 37. *See Wilkerson v. State*, 556 So.2d 453, 456 (Fla. 1st DCA 1990) (noting that suspect was not arrested merely for yelling at and cursing at officers, but rather because she refused to leave area were deputies conducting investigation).

15
